UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

HECTOR E. PINEIRO,                                    )     C.A. NO.: 010-_____-FDS
                                                      )
            Plaintiff                                 )
                                                      )
v.                                                    )
                                                      )
                                                      )
GARY GEMME, WORCESTER CHIEF of POLICE, )
And THE CITY OF WORCESTER, a Municipal                )
Corporation                                           )
                                                      )
            Defendants                                )
_____ )

## COMPLAINT AND REQUEST FOR JURY TRIAL

## INTRODUCTION

1.     This is an action for equitable, declaratory, and injunctive relief and for monetary
       damages against the City of Worcester and its chief of police, Gary Gemme, for
       abrogating plaintiff's Second Amendment right to carry a concealed firearm for personal
       protection by means of Chief Gemme's arbitrary, capricious and unlawful exercise of
       unfettered discretion, acting under color of law, in granting, denying, or restricting
       licenses to carry concealed firearms.

# JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over this action pursuant 28 U.S.C,
       sections 1331, 1343, 1367, 2201, 2202. This action is also brought pursuant to 42 U.S.C.
       § 1983, alleging violations of the Second and Fourth and Fourteenth Amendments to the
       United States Constitution.

## PARTIES

3.     Plaintiff Hector E. Pineiro ("Pineiro") resides in the City of Worcester, Worcester
       County, Massachusetts and is a citizen of the United States and of the Commonwealth of
       Massachusetts.

4.     Defendant Gary J. Gemme ("Gemme") is the Chief of the City of Worcester Police
       Department ("WPD") and is sued in his individual capacity and in his official capacity as
       a municipal policy maker.

5.     Defendant City of Worcester ("the City") is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts and the employer of Gemme.

## FACTS

6.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

7.     At all times pertinent hereto, defendants acted under color of law pursuant to the statutes, ordinances, regulations, policies, customs, practices, and usage of the Commonwealth of Massachusetts and/or the City of Worcester.

8.     Gemme, as Worcester Chief of Police, has authority pursuant to M.G.L. c. 140, § 131, to formulate, adopt, execute, and enforce the policies, customs and practices governing the issuance of licenses to carry concealed firearms ("LTCs") to Worcester residents, and at all times pertinent hereto Gemme has enforced, and is presently enforcing, the challenged laws and policies against the plaintiff so as to abrogate and deny to the plaintiff the right to carry a concealed firearm for self defense.

9.     Gemme is acting, and has acted at all times material hereto, under color of law pursuant to the aforesaid statute.

10.     Pineiro does not have adequate recourse under the laws of Massachusetts to remedy the denial of this right which is guaranteed to him by federal law, including but not limited to the Second and 14th Amendments to the U.S. Constitution .

11.     Pineiro is a law abiding citizen with no criminal convictions, complaints, or arrests on his record, who has lived at the same address in the City for about twelve years.

12.     Pineiro also owns real estate at 807 Main Street, Worcester, Massachusetts, in the Main South section of the City ("Main South"), where he runs a law practice, the Law Office of Hector E. Pineiro.

13.     Pineiro's law practice includes but is not limited to medical malpractice, criminal defense, civil rights, product liability, and prison condition and prisoner rights cases.

14.     Pineiro often works at his office until late the night and sometime into the early morning's hours.

15.     Main South is a relatively dangerous and menacing place in the late night and early morning hours, when it is not unusual to see drug dealers, pimps, and prostitutes loitering, walking, recruiting and negotiating with customers, consummating transactions, and at times engaging in verbal or physical altercations.

16.     The WPD has for years considered Main South to be a high crime area.

17.     Main South is, and for years has been, an area where illegal narcotics are sold and consumed and arrests for assault and battery, drug possession and/or trafficking, and for prostitution are common as compared to most other sections of the City.

18.     The Main South area has more arrests and police calls per capita than other sections of the City, as it has had for years prior hereto.

19.     A number of violent crimes have occurred over the years in Main South, including shootings within blocks of the plaintiff's office that have occurred since the late 1990's.

20.     Plaintiff has maintained a law office in Main South, in the 800 block of Main Street, since 1999 and since 2004 at 807 Main Street.

21.     When Pineiro goes to his office in Main South he has good reason to carry a concealed firearm for self defense.

22.     Pineiro has reasonable basis to believe criminals may target him for robbery because: he occupies a busy office in a well improved structure; due to his occupation he dresses as a professional; he and his practice are well known in Main South.

23.     To secure his office Pineiro has installed video surveillance/recording and alarm systems as well as cast iron gates at the door and grates on all ground level and other accessible windows.

24.     Pineiro has had encounters with individuals on or in the immediate vicinity of his property that have convinced him to seek an LTC for purposes of self-defense.

25.     It is not uncommon, when leaving his officer at night, for Pineiro to encounter persons in the parking lot of his office, or in the vicinity to the parking lot, who are engaged in various forms of criminal activity, loitering with no apparent purpose, or who approach him on all sorts of pretexts that invariably lead to requests or demands for money.

26.     Police records will reflect a number of calls made from Pineiro's office to the WPD reporting drug activity at or near the office parking lot, assaults in progress, individuals passed out from apparent drug or alcohol overdose, and even one call on behalf of an individual who claimed he was fleeing a group of people who were out to kill him.

27.     Pineiro has confronted drug users shooting or smoking drugs on the grounds or parking area of his office, and also prostitutes and their customers using his office parking lot as venue for their transactions at night and, on occasion, in broad daylight.

28.     A trend of increasing criminal activity in Worcester increases Pineiro's concern for his safety in the relatively high crime area of Main South.

29.     The Worcester Regional Research Bureau ("The Bureau") has reported that during 2008, "1,720 violent crimes and 6,362 property crimes were reported in Worcester. (Preliminary data from 2009 show 1,790 violent crimes and 6,691 property crimes). Aggravated assaults comprised three-fourth of the reported violent crimes (75%), followed by robbery (22%), rape (2.5%), and murder (0.4%). *The number of violent crimes has been increasing since 2004, from 1,383 in 2004 to 1,790 in 2009 (an almost 30% increase).* The increase has been concentrated in aggravated assaults while the other categories of violent crime has remained more or less stable." Benchmarking Public Safety in Worcester 2010, Report 10-04, July 26, 2010. P. 3-4 (emphasis added).

30.     The Bureau has also found that "larceny constituted the greatest proportion of property crimes reported in Worcester in 2008 (63%), followed by burglary (27%) and motor vehicle theft (11%). From 2006 to 2009, the number of property crimes in the city rose from 5,660 in 06 to 6,691 (an 18% increase)…" *Id*. at 4.

31.     In 2009 Pineiro began to consider whether he should seek an LTC for the purpose of self defense.

32.     Events in 2010 led Pineiro decide he would seek an LTC.

33.     On or about January 6, 2010, a knife wielding assailant seeking money slashed the neck and face of a cashier at  Mega Discount Store located at 731 Main Street, in the immediate vicinity of plaintiff's office at 807 Main.

34.     On or about May 5, 2010, two gun wielding criminals invaded plaintiff's Worcester home and assaulted his son.

35.     The home invasion occurred at approximately 5:30 p.m. in broad daylight.

36.     Plaintiff's 24 year-old daughter and 18 year-old son were at the home when two individuals came onto the property with the apparent intention of committing a robbery.

37.     Plaintiff's son was menaced and pistol-whipped in the head with a hand-gun, causing a laceration that required sutures.

38.     To date this crime remains unsolved.

39.     In August of 2010, Pineiro learned from the occupant of a dwelling next to his office that two males had climbed onto the roof of the plaintiff's building and attempted to enter through a second-story window that was not protected by a grate.

40.     Shortly after these two events, Pineiro, at considerable expense, had wrought iron grates installed at the entrance of his house and additional grates installed on windows of his office.

41.   On several occasions in the summer and fall of 2010 Pineiro found crack pipes littering the grounds and parking at his office.

42.    In furtherance of his intention to lawfully carry a concealed firearm for self defense, on October 25, 2009, Pineiro successfully completed the State Police Basic Firearm Safety course which, as prescribed by G.L. c. 140, § 131 and 515 CMR 3.00, which is required to obtain an LTC.

43.   A true copy of the certificate attesting to plaintiff's satisfaction of the aforesaid requirement is attached at **Exhibit 1.**

44.   In addition plaintiff successfully completed a five-day Hunters Education Course sponsored by the Massachusetts Division of Fisheries and Wildlife, a true copy of the certificate thereof, No. 1034045 dated March 8, 2010, is attached as **Exhibit 2**.

45.   On or about August 17, 2010 Pineiro applied for an LTC at the WPD. **Exhibit 3**.

46.   On or about August 2010 Pineiro also took a firearms course to learn about the responsibilities of carrying a concealed weapons. *See, infra*.

47.   On or about September 24, 2010, Gemme issued an LTC to Pineiro restricted to carrying a handgun for hunting or target practice only, and not allowing him to carry for the lawful purpose of self defense.

48.   Gemme failed and refused to issue Pineiro an LTC including the right to carry a handgun for self defense pursuant to authority he purports to have under state law, M.G.L. c. 140 § 131.

49.   The statute, on its face and as applied by Gemme, allows the adoption and practice of separate and disparate standards, or even – as in Worcester – a 'standard' solely of a police chief's personal discretion, for granting, restricting, suspending or revoking LTCs in each of the Commonwealth's  municipalities.

50.   Chapter 140 § 131 defines certain classes of persons it excludes from eligibility to hold LTCs (e.g., aliens, the mentally ill, persons under 21 years of age or who have been convicted of felonies or certain misdemeanors), and it authorizes chiefs of police to determine the suitability of LTC applicants to hold such licenses.

51.   In June 2008, the United States Supreme Court held that the Second Amendment to the United States Constitution protects fundamental, individual right to keep and to bear arms for self defense. *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008).

52.   On June 28, 2010, the United States Supreme Court reaffirmed the principles of *Heller*, holding that citizens have the right "to use [handguns] for the core lawful purpose of self-defense" because the Fourteenth Amendment makes the Second Amendment applicable to the states. *McDonald v. City of Chicago,* 08-1521, 561 U.S.____ , 130 S.Ct. 301 (6-28-2010).

53.   The Second Amendment to the United States provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

54.   The Second Amendment guarantees individuals a fundamental right to carry firearms in non-sensitive public places for purposes of self defense.

55.   The Second Amendment right to keep and bear arms applies to States and to municipalities by way of the Fourteenth Amendment.

56.   Notwithstanding the foregoing and notwithstanding the dearth of any legal basis to deny Pineiro his right to carry a handgun for personal protection, Gemme issued an LTC to Pineiro that does not encompass the carrying of a weapon for personal protection.

57.   The only remedy available to plaintiff under state law denies him the right and ability, both substantively and procedurally, to vindicate his Second Amendment right to bear arms for self defense.[1]

58.   M.G.L. c. 140 § 131, by its plain language, provides only for review of the reasonableness of a police chief's determination of an individual's suitability for an LTC; it does not provide for scrutiny of the chief's conduct in regulating a constitutional right, nor does it mandate nullification of unreasonable or unconstitutional action of a police chief in denying or restricting an LTC.

---

[1] M.G.L. c. 140, § 131 (f), as applied by the courts of the Commonwealth, gives chiefs of police "considerable latitude" to determine who is a "suitable person" worthy of an LTC. *Ruggiero v. Police Commissioner of Boston,* 18 Mass. App. Ct. 256, 259 (1984). Review is narrow in scope and, being limited to the 'reasonableness' of grounds for a chief's actions, deferential. *Godfrey v. Chief of Police of Wellesley,* 35 Mass. App. Ct. 42, 45 (1993). In contesting a police chief's suitability determination before a Massachusetts District Court, the burden is on the plaintiff to produce substantial evidence that he is a suitable person to hold an LTC, *Chief of Police of Shelburne v. Moyer,* 16 Mass. App. Ct. 543, 546 (1983). It is an administrative proceeding, not a trial between parties with power to compel testimony and production of evidence within the full scope of relevance in civil rights action (not to mention the right to trial by jury). *Id.* at 547. Despite limited scope of review, and corresponding limitation on discovery, a plaintiff has the burden of proving the chief's actions were arbitrary and capricious or an abuse of discretion. *Id.,* at 546, quoted in *Godfrey* at 46, and *Howard v. Chief of Police of Wakefield,* 59 Mass. App. Ct. 901, 902 (2003). Moreover, whatever remedies available to the Plaintiff under State law are woefully inadequate because the Massachusetts Supreme Judicial Court, recently held the Second Amendment does not apply to Massachusetts. *Commonwealth v. Runyan,* 456 Mass. 230, (2010)(the Massachusetts SJC believes unanimously that the Second Amendment does not apply to the States as a matter of substantive due process rights). The Massachusetts SJC does not believe either that the Massachusetts Declaration of Rights, art. 17, which provides "[T]he people have a right to keep and bear arms for the common defence . . ." was only intended to provide for the common defense and "does not guarantee an individual right to keep and bear arms." (quotations omitted).

59.    The statute requires a party seeking review of an adverse decision by a police chief regarding an LTC to convince a judge of the Commonwealth's District Court "that there was no reasonable ground for denying, suspending or revoking such license . . ." and if that standard is met the court "may" – not must – direct reversal of the chief's decision.

60.    Under the state law, review of a police chief's denial or restriction of an LTC does not allow discovery of all evidence pertinent to Second Amendment rights and it denies the right to a jury trial.

61.    Under color of the statute Gemme claims authority to deny, suspend or revoke LTCs based on selectively applied criteria and even to deny the right to carry concealed firearms for self defense to citizens generally based on no criteria at all, as he has done in the plaintiff's case.

62.    In his LTC application, Pineiro stated his reasons for seeking an LTC: "I had a home invasion at my home on 5/5/2010 (two armed suspects). Secondly, the type of work I do (civil/criminal), the hours when I leave my office (many times in excess of 9 pm) and the high crime area where I work. I have 'good reason to fear injury to [my] person or property.' MGL. c. 140 Section 131 (d). In support of this application I cite, *McDonald v. City of Chicago, (U.S. Supreme Court, June 28, 2010).*" (Emphasis). **Exhibit 3.**

63.    Pineiro made clear in his application that he was looking for a license to carry for all lawful purposes (a Class A license) and that he intended to carry a firearm for personal protection.

64.    Gemme refused Pineiro an unrestricted Class A license, which he must have to carry a concealed handgun for self defense, under a policy the chief adopted with the avowed intent of denying LTCs to citizens generally.

65.    Between November 14, 1996 and February 13, 2006 then Chief Edward P. Gardella, observed WPD Policy & Procedure No. 335 governing the issuance of firearms permits in Worcester. **Exhibit 4.**

66.    The aforesaid policy provided that the "[L]icense Division will issue to all qualified persons a Firearm Identification Card (F.I.D. card) upon completion of an approved application and payment of the current established fee." *Id.*

*67.*    WPD Policy & Procedure No. 335 further provided that the License Division "will issue Licenses to Carry Firearms to qualified persons having residential or business addresses within the City of Worcester." *Id.* [2]

68.    On February 13, 2006, four months after he was sworn in as Chief, Gemme radically altered the policy governing issuance of LTCs in Worcester -- first, as to the

---

[2] The policy created waiver of fees for police officers, animal control offices and airport police.

determination of who was "suitable" to exercise the right to bear arms for self defense, and second, at to issuance of LTCs with restrictions that eviscerate the right to bear arms. **Ex. 5**, Gemme Directive of February 13, 2006.

69.    With commendable candor, Gemme stated in the aforesaid directive:   *"[I]t is my intent to narrowly define the use or purpose on all LTC applications, and correspondingly, on all LTC permits, and to establish a high standard for the term 'suitable person.' "* (Emphasis provided).  *Id.*

70.    The Massachusetts Firearms Regulatory Scheme does not define the term "*suitable person.*"

71.    Gemme's policy sets out a number of potentially unconstitutional reasons for denying an LTC to a citizen including, for example, "Employment status" and "any past, present affiliation, association, or cohabitation with any person or group with a known criminal history." *Id.* at ¶ 5, 6.

72.    The Gemme policy states that: "[W]hen determining whether the applicant for a LTC is a 'suitable person,' the Chief may consider evidence underlying a criminal charge even if the matter was dismissed, continued without a finding, the record sealed, or even if the governor pardoned the offender."

**73.**    The Gemme policy flatly states that licenses to carry for all lawful purposes -- required to carry for self defense as the plaintiff wishes to do **"shall not be granted."** (Emphasis added.)

74.    The Gemme directive further states:

The LTC issued by the Chief of Police shall specifically state the use or purpose.  The following guidelines shall be used in determination of use or purpose:

1.    Personal Protection-good reason to fear injury to his person or property. The good reason needs to be specifically articulated on the application to carry for the LTC.

2.    Additional Limitations for Personal Protection:
   a.    Work/employment only: concealed or non-concealed;
   b.    Employment only: may only be used in public while acting within the scope of employment;
   c.    Only while transporting money to and from place of employment to depository;
   d.    Business Only: not to be removed from business;
   e.    Day time only, from one-half hour before sunrise to one-half hour after sunset;
   f.    No firearm removed from residence /home only;

3.      Sporting-hunting and target club only;
4.      Target-at shooting club or facility only;
5.      Hunting –large capacity rifle and shotgun only;
6.      **All lawful purposes –restricted to active and retired law enforcement officers**.” *Id.* (Emphasis added.)

75.    Defendants policy goes on to say that “[T]he parameters established in this policy for a “suitable person,” and for the use or purpose shall apply to applicants for a new LTC and for a renewal of a LTC.” *Id.* at p. 2.

76.    The assertion that the parameters articulated in the Defendants policy to establish suitability apply to all applicants for new LTC and for renewal of LTC is patently false as the policy arbitrarily distinguishes which citizens get a Class A license for self-defense and which don’t. *See discussion infra.*

## [PINEIRO’S FIREARM APPLICATION]

77.    When Pineiro applied to Gemme for an LTC on or about August 17, 2010, detectives at the WPD processed his application and took his fingerprints for a criminal background check.

78.    In his application Pineiro cited the case of *McDonald v. City of Chicago,* to show that it had been clearly established before that time that citizens have the right to carry firearms for self-defense. **Exhibit 3.**

79.    Besides the training in firearms safety referenced above, in 2010 Pineiro took another gun course at the Hartford Gun Club, completing the Utah Department of Public Safety Concealed Firearm Permit, and provided Gemme a copy of that certificate on or about November 3, 2010. **Exhibit 6**, certificate number C411250.[3]

80.    On September 24, 2010 Pineiro went to the WPD licensing division to inquire on the status of his application.

81.    At that time and place Pineiro received a Class A “Large Capacity License to Carry Firearms” (M.G.L. c. 140 § 131).

82.    But instead of getting an unrestricted Class A LTC for a CW, Chief Gemme, placed restrictions on Pineiro’s Class A license.

---

[3] The State of Utah, in turn has reciprocity agreements with the following states regarding a LTC a CW: Alaska, Colorado, Florida, Georgia, Louisiana, Mississippi, New Hampshire, North Carolina, North Dakota, Ohio, Texas, Virginia, Washington State and West Virgina.

83.    Those restrictions where that Pineiro would get a Class A license with the following: *"**Restrictions: Sporting & Target**."* (Emphasis provided). Exhibit 7.

84.    These restrictions violate Pineiro's constitutional rights to self defense.

85.    When Pineiro was handed his firearms license and noticed the restrictions, he told one of the detectives assigned to the licensing unit that the license granted, was unacceptable.

86.    The detective told Pineiro he would speak with the Chief regarding this concern, but Pineiro never heard back from Gemme or from the licensing division at the WPD.

87.    On November 3, 2010 Pineiro wrote to the Chief by certified mail/return receipt requested, to express the concerns over the restrictions imposed over his Class A license and asking for reconsideration over the licensing restrictions imposed in the event there had been any misunderstanding as to the class of license he was seeking. **Exhibit 8**.

88.    In that letter, Pineiro wrote to Chief Gemme: "[L]et me say this in the most respectful but forceful way. I believe that I have an absolute constitutional right to protect myself and my family from any threat or harm."

89.    As a last resort, and because Pineiro had not received a response to his November 3rd certified letter, Pineiro spoke with staff from the City of Worcester Law Department in order to clarify the type of license that would be granted.

90.    Pineiro was told the City had good news for him, that notwithstanding the written restrictions imposed by Chief Gemme upon his request for a license to carry a firearm for "all lawful purposes" issue, i.e. sporting & target, that Pineiro could carry a concealed weapon to and from his office and could also carry a loaded weapon while driving and have access to his firearm at home.

91.    Pineiro was told that the restrictions on a Class A license with a sporting and targeting restrictions was more than anything a formality adopted by the Chief in the event the Chief felt that the license should be revoked in the future.

*92.*    This advice, that Pineiro could carry a loaded and concealed weapon with a Class A sporting and targeting restriction, was not only erroneous but could place Pineiro at risk of violating the Massachusetts gun laws and being criminally prosecuted for carrying a concealed firearm without a license to do so. *See infra discussion.*

93.    Apart from any threats posed by the individuals that invaded Pineiro's home and those he may come in contact with at his office, Pineiro would carry a firearm at all times for self defense but refrains from doing so because he fears arrest, prosecution, fine, imprisonment and the loss of his license to practice law in Massachusetts and other jurisdictions because he does not have a license to carry a firearm.

94.   In Massachusetts it is a felony for a person to carry a firearm without a license. G.L. c. 269, § 10(a).

95.   The monthly newsletter of the Massachusetts Chiefs of Police Association, Inc., makes clear that a person with a Class A license with restrictions, cannot carry a concealed weapon:  "[I]f the purpose for issuing a Class B LTC is because the Chief wants to prevent the license from carrying a handgun loaded and concealed, he issues a Class A LTC restricted to "TARGET & HUNTING." This will accomplish the same result without the confusing issue of what can or cannot be owned or possessed with a particular license." *See, e.g.,* Glidden R, and Collins J, *Firearms Licensing Problem Areas,* INSIDE, April 2010, Vol. 4-10, at pages 16-18. http://www.masschiefs.org/documents/May%202010%20Newsletter.pdf.

96.   The Medford, Massachusetts, Police Department, makes this point as well: "Class A License to Carry: allows the holder to purchase, possess and transport Large Capacity Handguns, Rifles and Shotguns, as well as their respective large capacity loading devices; it further allows the bearer to carry a loaded, concealed handgun in public. *This is the only permit that allows the holder to carry a loaded, concealed firearm in public."* www.medfordpolice.com/gunpermits.htm (Emphasis).

97.   The Federal Bureau of Investigations web site which describes the state by state gun laws also explains the obvious: that with a "Class A: This license allows purchase any firearm legal in the state of Mass, are authorized to own fire arms holding greater than 10 rounds, and can carry a loaded concealed firearm unless restrictions are place on the license by Chief of Police of the issuing town, if the Class A is restricted to Hunting and Sport or Target and Hunting, it carries the same restrictions as a Class B, with the exception of owning large capacity."  http://fbinicsystem.com/us-gun-laws-by-state/massachusetts-gun-law.html.

98.   "[T]arget & Hunting-restricts possession to the purposes of lawful recreational shooting or competition; for use in the lawful pursuit of game animals and birds, for personal protection in the home; and for the purpose of collecting (other than machine guns). Includes travel to and from activity location." http://www.handgunlaw.us/documents/NonResidentPermits.pdf

99.   "[S]porting restricts possession to the purpose of lawful recreational shooting and completion; for use in lawful pursuit of game animals and birds; for personal protection I the home; for the purpose of collecting (other than machine guns); and for outdoor recreational activities such as hiking, camping, cross country skiing or similar activities. Includes travel to and from activity location." *Id.*

100.  In accordance with the FBI web-site, "The definition of the restrictions on a Class A is on a town by town basis and is set by the Chief of Police of the issuing town, there is no uniform state definition with regards to the restrictions placed on a Class A, they are different on a town to town basis." *Id.*

101.   Presently, when Pineiro leaves his office at night if he is ever threatened with serious bodily harm he cannot carry a firearm and defend himself.

102.   Pineiro was later told that the Chief had denied his request to a LTC without restrictions but Pineiro was never formally notified in writing of this restriction.

103.   Pineiro is eligible and legally qualified to possess firearms and other than the supposed inadequacy of his perceived "unsuitability" he can satisfy the legal requirement for the issuance of a LTC a CW.

104.   Neither Worcester's firearm's policy nor Massachusetts State Law can restrict or condition Pineiro's right to exercise his Second Amendment rights to self defense  by placing the burden on him to demonstrate that he has good reason to fear injury to his person or property.

105.   Pineiro's is eligible to have an unrestricted LTC for self defense.

106.   Pineiro has met all the requirements that Massachusetts laws requires to have a LTC for personal protection.

107.   Pineiro was denied a LTC for personal protection by the Defendants upon a finding, presumably, that the Plaintiff is an unsuitable person to carry a firearm for personal protection and self-defense.

108.   Pineiro was also denied a LTC for personal protection by Chief Gemme, in part, because in the past and presently he was brought a number of federal civil right lawsuits against the City of Worcester in which he has named Gemme as party-defendant in police misconduct cases.

109.   Chief Gemme has not stated the reasons why he feels Pineiro is an unsuitable person to carry a concealed firearm for self defense, and in fact he may not have made any such determination as his officially stated goal is to deny such licenses to citizens generally.

110.   Chief Gemme has granted and renewed unrestricted LTCs to individuals with no cognizable distinctions compared to Pineiro as to their suitability for carrying concealed weapons for self defense, but only because they are public employees, have political connections or because of his personal regard for them.

111.   On the other hand, when he sees fit to do so Gemme disregards criteria on the basis of which he had denied licenses to some so as to allow them to others, and he has even disregarded statutory restrictions so as to allow or continue LTCs to persons found guilty of crimes.

112.   In short, Gemme grants, denies and/or restricts LTCs arbitrarily and capriciously as to

Worcester citizens generally and has arbitrarily and capriciously, and without legal basis, denied Pineiro the right to carry a concealed firearm for self defense.

113.    Aggrieved by this decision Pineiro filed at the same time as this Federal Complaint, a Petition for Judicial Review of Refusal To Issue a License to Carry a Firearm in the Worcester District Court in accordance with General Laws (Ted.Ed.) Chapter 140, § 131. See **Exhibit 9**.

114.    Pineiro has a judicial review hearing in Worcester District Court scheduled for April 8, 2011.


<u>COUNT I</u>
**[All Defendants 42 U.S.C. § 1983 – Second And Fourteenth Amendments]**

115.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

116.    Neither the Worcester policy nor the Massachusetts Statute can impose upon the Plaintiff a requirement to prove (or to shift the burden of proof onto him to show) that he has good reason to fear injury to his person or property in order to exercise his fundamental constitutional right to keep and bear arms for self defense.

117.    Pineiro cannot be required to demonstrate that in order to carry a firearm "he has good reason to fear injury to his person or property" or that he faces a greater than average level of danger, as a condition to exercise his Second Amendment rights.

118.    Worcester's policy, and the C. 140, § 131 (d) requirement that applicants for an LTC demonstrate that they have "good reason to fear injury to his person or property," violate the Second Amendment to the United States Constitution and the plaintiff is therefore entitled to permanent injunctive relief.

119.    Worcester's policy and the C. 140, § 131 (a) delegation to a licensing authority the ability to impose "such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper," violates the Second Amendment to the United States Constitution and plaintiff is therefore entitled to permanent injunctive relief.

120.    By refusing to issue an LTC for all lawful purposes to Pineiro based on a subjective and unattainable standard of what constitutes a "suitable person" and what constitutes "good reason to fear injury," Defendants are abusing their discretion and propagating customs, policies and practices that infringe on plaintiff's right to possess and carry firearms as guaranteed by the Second and Fourteenth Amendments.

121.    By refusing to issue an LTC for all lawful purposes and by adopting a policy that a request for "all lawful purposes" (or a Class A license for personal protection) "shall not be granted," defendants are violating the plaintiff's right to possess and carry firearms as

guaranteed by the Second and Fourteenth Amendments.

122.    Defendants cannot satisfy their burden of justifying these customs, policies and practices that infringe on Plaintiff's rights.

123.    Plaintiff is entitled to permanent injunctive relief against these unconstitutional customs, policies and practices.

COUNT II

**[All defendants 42 U.S.C. § 1983 – Equal Protection]**

124.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

125.    The requirements of  C. 140, § 131 (d) and of Worcester's that LTC applicants demonstrate cause for the issuance permits violates the Fourteenth Amendment right to equal protection of the law and plaintiff is therefore entitled to permanent injunctive relief against the enforcement of this provision.

126.    Moreover, Plaintiff was treated differently than other similarly situated LTC a CW applicants because Plaintiff is not politically-connected.

127.    Plaintiff was treated differently than other similarly situated individuals unrestricted LTCs pre-dated Gemme's tenure, as they seldom have difficulties renewing these licenses for personal protection.

128.    Plaintiff was treated differently than other similarly situated LTC applicants because Plaintiff is not a police officer.

129.    Gemme denied plaintiff an unrestricted LTC while granting LTCs to certain individuals (including police officers) who were clearly unsuitable to carry them because of statutory disqualifications.

130.    Plaintiff was treated differently than other similarly situated LTC applicants because Plaintiff has filed numerous federal civil rights lawsuits naming the City and Chief Gemme as party defendants.

131.    Plaintiff is entitled to permanent injunctive relief against these unconstitutional customs, policies and practices.

**DEMANDS FOR RELIEF**

The Plaintiff hereby respectfully requests the following relief:

1.  An order permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Massachusetts General Law Chapter 140, § 131(a) & (d);
2.  An order permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from denying plaintiff an unrestricted LTC on grounds that plaintiff does not face the level of danger higher than that which an average person would reasonably expect to encounter;
3.  An order commanding defendants to issue Pineiro an unrestricted permit to carry a handgun for all lawful purposes;
4.  An award in plaintiff's favor for all costs of suit, including attorney fees, interest, costs and expenses as per § 1983 and 1988;
5.  Declaratory relief consistent with the injunction;
6.  All compensatory damages recoverable;
7.  All punitive damages recoverable;
8.  Any and all other relief as the Court deems just and proper;
9.  That defendants be found joint and severally liable.

<u>PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT</u>


Respectfully submitted,
Plaintiff


*/s/ Hector E. Pineiro*
Hector E. Pineiro, BBO # 555315
Law Office of Hector E. Pineiro
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com

Dated: December 31, 2010