UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HECTOR E. PINEIRO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 10-40262-FDS |
| GARY GEMME, Worcester ) | |
| Chief of Police, and the CITY OF ) | |
| WORCESTER, a municipal ) | |
| corporation, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS OR STAY ON ABSTENTION GROUNDS

This action is a federal constitutional challenge to the partial denial of plaintiff's

application for a gun license.  Plaintiff Hector Pineiro applied to the Worcester Chief of Police for

an unrestricted license that would allow him to carry a concealed weapon in public for self-

defense.  The Police Chief—who, by statute, is charged with processing gun license

applications—granted him a license that was restricted to sport and target-shooting uses.  Pineiro

sought judicial review of the licensing decision in Massachusetts state court, alleging violations of

the state gun licensing statute, Mass. Gen. Laws ch. 140, § 131.  He concurrently sued the city

and the Police Chief in this Court, alleging facial and as-applied violations of his federal

constitutional right to bear arms under the Second Amendment.

Defendants have filed a motion to dismiss or stay plaintiff's action in this Court under the

doctrine of *Pullman* abstention.  They contend that abstention is appropriate because ch. 140,

§ 131 contains ambiguities that are relevant to plaintiff's constitutional claims and that resolution

of those issues in the pending state action may avoid the need to reach the constitutional issues.

For the reasons set forth below, the Court has concluded that abstention is inappropriate, and the motion will accordingly be denied.

## I.      <u>Factual Background</u>

The facts are stated as alleged in the complaint.

Hector E. Pineiro lives and works as an attorney in Worcester, Massachusetts.  (Compl. ¶¶ 3, 12).  Since 1999, he has kept offices in the Main South neighborhood of Worcester, an area with a relatively high rate of violent crime and drug use.  (*Id.* ¶¶ 17-20, 29-30).  Pineiro often works late at the office, and on several occasions he has witnessed crimes in progress when leaving at night.  (*Id.* ¶¶ 24-25).  Statistics indicate that the incidence of violent crime in Worcester increased by about thirty percent between 2004 and 2009.  (*Id.* ¶ 29).

Perceiving violent crime to be a threat to his own safety and to that of his family, Pineiro began in 2009 to consider seeking a license to carry a firearm for self-protection.  (*Id.* ¶ 31).  In January 2010, two gun-wielding individuals entered Pineiro's home and assaulted his eighteen-year-old son.  (*Id.* ¶ 26).  Seven months later, in August, a resident of Main South told Pineiro that two males had been seen attempting to break into Pineiro's office through the second-story window.  (*Id.* ¶ 39).  These events convinced Pineiro to apply for the gun license.  (*Id.* ¶ 32).

In Worcester, Chief of Police Gary J. Gemme is the licensing authority charged with processing gun license applications under Mass. Gen. Laws ch. 140, § 131.  (*Id.* ¶ 4).  In August 2010, Pineiro applied to Police Chief Gemme for an unrestricted license to carry a large capacity firearm.  (*Id.* ¶ 45, Ex. 3).  The application cited the prior invasion of his home and crime in the area surrounding his office as providing "good reason to fear injury " to his person or property.

(*Id.*).

On September 24, 2010, Gemme granted Pineiro a license, but not the license he wanted. (*Id.* ¶¶ 64, 82, 83, Ex. 7, Ex. 8). Instead of the "unrestricted" license that Pineiro had requested, which would have allowed him to carry a concealed weapon in public for self-defense, Gemme issued a license subject to the restriction that it permitted sport and target-shooting uses only. (*Id.*).

On December 22, 2010, Pineiro filed for judicial review of the Police Chief's license decision in the Worcester District Court pursuant to Mass. Gen. Laws ch. 140, § 131(f). (*Id.* ¶ 113, Ex. 9). That action remains pending.

On December 31, 2010, Pineiro filed this action against Gemme and the City of Worcester, pursuant to 42 U.S.C. § 1983, seeking injunctive, monetary, and declaratory relief. He alleges that the Massachusetts licensing statute and Gemme's licensing policy violate his rights under the Second and the Fourteenth Amendments of the United States Constitution. Defendants have moved to dismiss or, alternatively, to stay the action on abstention grounds, citing Pineiro's parallel proceeding in state court.

## II.   <u>The Regulatory Framework</u>

In Massachusetts, it is a felony to carry a firearm in public without a valid license. Mass. Gen. Laws ch. 269, § 10.[1] Licenses to carry guns may be requested by application pursuant to Mass. Gen. Laws ch. 140, § 131(d). Applications are made to a "licensing authority," which is

---

[1] For purposes of the statute, "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." Mass. Gen. Laws ch. 140, § 121.

defined as either the applicant's local police chief or the State Police colonel. *Id.* §§ 121, 131(d).[2]

The statute specifies the circumstances under which the licensing authority may grant licenses,

when licenses may be revoked, and what restrictions licenses may contain. *Id.* § 131(a)-(b).

Licensing decisions are subject to judicial review in the District Court having jurisdiction in the

locality wherein the person applied for the license. *Id.* § 121(f).

In processing a license application, the licensing authority is required to conduct a

"two-step inquiry" to determine the applicant's eligibility. *Ruggiero v. Police Com'r of Boston*,

18 Mass. App. Ct. 256, 259 (1984). At the first step of the inquiry, the licensing authority looks

at the applicant's personal suitability for gun ownership. *Id.* Several specific groups of applicants

(for example, minors and the mentally ill) are categorically barred from gun possession. Mass.

Gen. Laws ch. 140, § 131(d)(i)-(vii). However, even an applicant who does not fall within the

statute's specific exclusions is ineligible for a license unless the applicant can demonstrate that he

or she "is a suitable person to be issued such license." *Id.* § 131(d).

At the second step of the application inquiry, the licensing authority is required to consider

whether the applicant has a "proper purpose" for carrying a firearm. *Ruggiero*, 18 Mass. App.

Ct. at 259. The statute does not give an exhaustive list of valid reasons for seeking a license; it

merely provides that the applicant must show "good reason to fear injury to his person or

property, or . . . any other reason, including the carrying of firearms for use in sport or target

practice." Mass. Gen. Laws ch. 140, § 131(d). Massachusetts courts have confirmed that this

"proper purpose" showing, while open-ended, is a prerequisite to license approval that is distinct

---

[2] The statute distinguishes Class A licenses (for large-capacity firearms) from Class B licenses (for non-large-capacity weapons), but the same application procedures apply to each. *Id.* § 131(a)-(b), (d).

from the "suitable person" determination. *Ruggiero*, 18 Mass. App. Ct. at 260. Thus, when an applicant seeks a license solely for self-protection, the license authority may rely on this purpose requirement in demanding that the applicant distinguish his or her own needs from those of the general public. *Id.* at 261 (finding that applicant's stated purposes to avoid "spend[ing] his entire life behind locked doors [and to prevent becoming] a potential victim of crimes" did not require issuance of a license for self-defense in public).

Even when an applicant meets the requirements for license approval, the licensing authority may issue the license "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. Laws ch. 140, § 131(a). Pursuant to this provision, the licensing authority may restrict a license to those uses for which the authority determines there to be a "proper purpose," even if it is not the purpose proposed by the applicant. *Ruggiero*, 18 Mass. App. Ct. at 260 (upholding issuance of license for target and sport use where applicant requested license for self-defense purposes).

Upon judicial review, the licensing authority's determination regarding suitability may be reversed only if it has "no reasonable ground" or is "arbitrary, capricious, or an abuse of discretion." *Chief of Police of Shelburne v. Moyer*, 16 Mass. App. Ct. 543, 546 (1983). Likewise, the licensing authority's determination regarding "proper purpose" may be reversed only if the decision is "arbitrary, capricious or an abuse of discretion." *Id.* at 259 (citing *Moyer*, 16 Mass. App. Ct. at 546).

In his capacity as the licensing authority in Worcester, Police Chief Gemme issued a directive in 2006 setting forth his policy for implementing the statute's licensing standards. In that document, the Police Chief noted the broad discretion granted to him in making the initial

"suitable person" determination.  (Compl. Ex. 5).  As to the "proper purpose" requirement, the

Chief interpreted the statute to require a showing of "good reason to fear injury" for all licenses

sought for personal protection purposes.  *Id.*  Finally, the directive provided that *all* licenses

granted will be subject to *some* restriction.  *Id.* ("[t]he request for 'all lawful purposes,' shall not

be granted").

## III.   Analysis

### A.      Plaintiff's Second Amendment Claims

Plaintiff alleges that the Massachusetts gun licensing scheme violates his federal

constitutional right to bear arms for the purpose of self-defense.  The Second Amendment

provides as follows:  "[a] well regulated Militia, being necessary to the security of a free State, the

right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In

2008, the Supreme Court struck down a District of Columbia ordinance that prohibited the

possession of handguns in the home, declaring that the amendment guarantees "the individual

right to possess and carry weapons in case of confrontation."  *District of Columbia v. Heller*, 554

U.S. 570, 592 (2008).  In *McDonald v. City of Chicago*, the Court affirmed that this right to

carry firearms for the "core lawful purpose of self-defense" is incorporated into the protections

against infringement by the states provided by the Fourteenth Amendment.  130 S. Ct. 3020, 3026

(2010).

The First Circuit has discussed the *Heller* and *McDonald* decisions in two decisions,

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), and *United States v. Booker*, 644 F.3d 12

(1st Cir. 2011).  In *Rene E.*, the court held that the federal Juvenile Delinquency Act's ban on

possession of handguns by minors, 18 U.S.C. § 922(x)(2)(A), does not violate the Second

Amendment's right to bear arms as recognized in *Heller*.  In *Booker*, the court upheld another federal statute, 18 U.S.C. § 922(g)(9), which makes it a crime for an individual convicted of a "misdemeanor crime of domestic violence" to possess firearms.  644 F.3d. at 13-14.  The First Circuit recognized that "the *Heller* Court did not identify a standard of review for regulations that restrict Second Amendment rights, apart from rejecting rational basis review and 'interest-balancing.'"  *Rene E.*, at 11 n.4. (quoting *Heller*, 554 U.S. at 628 n.27).  The court elected to apply an intermediate level of scrutiny, according to which "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." *Booker*, 644 F.3d at 25 (quoting *United States v. Skoien*, 614 F.3d 628, 642 (7th Cir. 2010)).

Citing *Heller* and *McDonald*, plaintiff challenges the Massachusetts gun-licensing scheme both facially and as applied in the Gemme policy and his particular licensing decision.  Plaintiff's first claim is that Mass. Gen. Laws ch. 140, § 131(d)'s "suitable person" standard for license eligibility violates his Second Amendment right because it is "subjective and unattainable."  The *Heller* and *McDonald* decisions did not directly address the constitutionality of gun regulations that restrict the class of eligible licensees according to a discretionary judgment of suitability.  The *Heller* decision did condone gun regulations that exclude certain categorically-defined classes of individuals.  Specifically, the Court provided a non-exhaustive list of classes of persons who may be prohibited from gun possession—namely, felons and the mentally ill.  *Heller*, 554 U.S. at 626. It left undecided, however, whether a statute may permissibly delegate to an administrative official the case-by-case determination whether an applicant falls within the excluded class according to a generalized standard.  Plaintiff argues that the "suitable person" requirement is unconstitutional

for doing exactly that.

Plaintiff's second claim concerns the statute's "proper purpose" licensing requirement. As noted, the statute requires an applicant to show that he is seeking a license due to "good reason to fear injury to his person or property, or for any other reason." Mass. Gen. Laws ch. 140, § 131(d). The Gemme policy states that the Police Chief will approve licenses for self-protection purposes only if the application shows "good reason to fear injury," and not for any other reason. Although it is clear after *Heller* and *McDonald* that the Constitution does not create a right to carry a firearm "in any manner whatsoever and for whatever purpose," it is equally clear that self-defense is a "core lawful purpose" protected by the Second Amendment. *Heller*, 554 U.S. at 626, 630; *McDonald*, 130 S. Ct. at 3036, 3047. Plaintiff's challenge to the "good reason to fear injury" requirement thus raises the question whether a state law may define a purpose-based restriction limiting gun possession for self-defense to individuals who can demonstrate some level of personalized need for the weapon in their license application.

Plaintiff's final claim challenges the delegation to the licensing authority of the power to impose any restriction on the "possession, use or carrying of firearms" that the authority "deems proper." *See* Mass. Gen. Laws ch. 140, § 131(a). In his directive, Police Chief Gemme asserts the prerogative to deny all requests for unrestricted licenses and to respond to applications for licenses "for all lawful purposes" by issuing licenses subject to some limitation. Massachusetts case law suggests that the statute does in fact entrust such power to the licensing authority's discretion. Indeed, one court has upheld a restriction decision nearly identical to the one in this case, in which the licensing authority responded to the applicant's request for an unrestricted license for self-protection in public by issuing a license for sport and target practice use only. *See,*

8

*e.g.*, *Ruggiero*, 18 Mass. App. Ct. at 257.  Again, the *Heller* and *McDonald* opinions offer only limited guidance as to the merits of plaintiff's constitutional challenge.  While the *Heller* court noted that "the right secured by the Second Amendment is not unlimited," 554 U.S. at 626, it did not define the scope of permissible case-specific restrictions on an applicant's ability to carry a weapon in self-defense.  Plaintiff therefore raises the question of the constitutionality of a regulatory scheme alleged to be so discretionary as to allow the licensing authority to use restrictions to effectively preclude any right to carry a firearm in public for self-protection.

### B.    *Pullman* **Abstention Principles**

Defendants have moved to dismiss or stay this action under the *Pullman* abstention doctrine in light of the pendency of the pending state court action seeking judicial review of the licensing decision.

In *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), the Supreme Court announced a doctrine that permits federal courts to stay adjudication of an action involving a "substantial constitutional issue" where "a definitive ruling on [a] state issue would terminate the controversy."  This limited, discretionary doctrine, designed to avoid premature constitutional determinations, is based on the premise that "federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them."  *Harrison v. National Ass'n for the Advancement of Colored People*, 360 U.S. 169, 175 (1959).

Abstention under the *Pullman* doctrine is appropriate only "where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question."

*Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008); *see also Fideicomiso De La Tierra v. Fortuno*, 604 F.3d 7, 16 (1st Cir. 2010) (referring to the "discretionary doctrine" of *Pullman* abstention). "Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute the meaning of which is unclear under state law." *Barr v. Galvin*, 626 F.3d 99, 107 (1st Cir. 2010) (internal quotation marks omitted) (quoting *Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 84 (1975)).

However, abstention when state law is unambiguous is impermissible, "because it would convert abstention from an exception into a general rule." *Rivera-Puig v. Garcia-Rosario*, 983 F.2d 311, 322 (1st Cir. 1992) (internal quotations omitted) (*quoting Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 598 (1976)); *see also City of Houston, Tex. v. Hill*, 482 U.S. 451, 468 (1987) (rejecting abstention when a state statute that had not been interpreted by a state court nonetheless was not "fairly subject to an interpretation which will avoid or modify the federal constitutional question"). And even when the state law is potentially ambiguous, abstention is disfavored unless a pending state-court action "will likely resolve the state-law questions underlying the federal claim." *Ford Motor Co. v. Meredith Motor Co., Inc.*, 257 F.3d 67, 72 (1st Cir. 2001) (quotations omitted) (*quoting Harris County*, 420 U.S. at 83).

When a plaintiff chooses to bring suit in federal court to enforce an enumerated personal right under the Constitution, "to force the plaintiff . . . to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967). *Cf. Dombrowski v. Pfister*, 380 U.S. 479, 489-490 (1965) ("abstention . . . is inappropriate for cases [where] . . . statutes are justifiably attacked on their face as abridging free expression."). Thus, a federal court cannot abstain simply

10

to give a state court the first opportunity to vindicate federal rights.  *McNeese v. Board of Educ.*, 373 U.S. 668, 672 (1963); *Harman v. Forssenius*, 380 U.S. 528, 534-535 (1965) ("[i]f the state statute in question . . . is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction.").

## C.   Application of *Pullman* to Plaintiff's Claims

Defendants contend that, under *Pullman*, this Court should dismiss or stay this action because plaintiff's state court action may resolve the underlying state-law issues and render a constitutional ruling unnecessary.  Without addressing the merits of plaintiff's constitutional challenge, the Court finds the argument for *Pullman* abstention unavailing.

As noted, plaintiff's constitutional claims derive from three provisions of Mass. Gen. Laws ch. 140, § 131:  (1) the "suitable person" standard for personal eligibility to possess a gun, (2) the "proper purpose" standard manifested in the "good reason to fear injury" requirement for self-protection licenses, and (3) the delegation of discretionary authority to subject licenses to use restrictions.  Those provisions contain no ambiguities that the state courts have not had an opportunity to construe.  Thus, neither plaintiff's pending state court action nor any other state decision is likely to alter the constitutional questions presented to this Court.  Dismissing or staying the action would therefore be inappropriate.

### 1.   "Suitable Person" Standard

As noted, plaintiff contends that the "suitable person" standard under ch. 140, § 131(d) for gun license eligibility excludes an impermissibly broad class of persons from exercising their Second Amendment rights.  As noted, in the First Circuit, the appropriateness of abstention must

be evaluated according to the two-prong *Batterman* test.  Abstention is proper only "where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question."  The gun licensing statute's "suitable person" standard meets neither of these requirements.

First, decisions of the Massachusetts courts demonstrate that no substantial uncertainty exists over the meaning of the term "suitable person" under the statute.  Those courts have held that the licensing authority's "suitable person" determination comprises all judgments about the applicant that are "reasonably related to effectuating the purposes of [ch. 140 § 131]."  *MacNutt v. Police Com'r of Boston*, 30 Mass. App. Ct. 632, 635 (1991).  The statute's essential purpose has been described as "to limit access to deadly weapons by irresponsible persons."  *Ruggiero*, 18 Mass. App. Ct. at 258.  Massachusetts decisions have specified the acceptable criteria for making the suitability determination.  Generally, the licensing authority is permitted to consider any fact that has "relevance" to the standard's underlying purpose.  *Moyer*, 16 Mass. App. Ct. at 547.  More specifically, courts have upheld the use of handling and proficient firing tests, *MacNutt*, 30 Mass. App. Ct. at 635; evidence of acts underlying pardoned offenses, *DeLuca v. Chief of Police of Newton*, 415 Mass. 155, 160 (1993); and police reports (notwithstanding their hearsay nature), *Charbonier v. Chief of Police of Melrose*, 66 Mass. App. Ct. 1105, at *2-3 (2006).  The case law as a whole thus establishes that "suitable person" means a person who is sufficiently responsible and skilled with firearms to hold a license without posing a risk to public safety.  This standard is flexible, and contemplates substantial discretion on the part of the licensing authority during the

application process; but a flexible standard is not the same as an ambiguous one.[3]  At least in the

abstract, the term "suitable person" is sufficiently clear for this Court to address whether it

impermissibly expands the class of persons for whom gun possession is prohibited in

Massachusetts.  The Court therefore sees no "substantial ambiguity" under the first prong of the

*Batterman* test.

Even if such ambiguity did exist, abstention on this issue would be precluded at step two

of the *Batterman* inquiry, which focuses on whether "settling the question of state law will or may

well obviate" the need for a constitutional ruling.  Where courts have confronted allegations that a

statute's ambiguous standard is unconstitutional due to its overbreadth, this inquiry has focused

on whether the statute is susceptible to a "limiting construction" that would avoid the potential

constitutional conflict.  *See Houston v. Hill*, 482 U.S. at 467.  Here, no state-court ruling is likely

to narrow the "suitable person" standard adequately to avoid the constitutional question under

*Heller*.  On the issue of class-based gun regulations, the only clear legal rule established by the

*Heller* court is a limited "safe harbor" consisting of a non-exhaustive list of classes (felons and the

mentally ill) that may be permissibly excluded from gun possession.  *Heller*, 554 U.S. at 626.

Massachusetts courts have already found that the category of persons deemed unsuitable under

the statute includes individuals outside of those "safe harbor" classifications.  For example, courts

have upheld license denials based on the applicant's lack of competency in gun handling.

*MacNutt*, 30 Mass. App. Ct. at 636.  Future state court rulings might further define the contours

of the "suitable person" standard, but those clarifications would not likely settle the question

---

[3] Indeed, as plaintiff points out, because the Police Chief's licensing decisions are administrative determinations that are reviewed only for abuse of discretion, state-court decisions are unlikely to clarify the "suitable person" standard with the degree of specificity that a more searching form of review might yield.

whether the statute, by denying the right to bear arms to at least some classes of persons other than the two prohibitions endorsed in *Heller*, violates the Second Amendment.

In sum, because the Massachusetts courts have clarified the meaning of "suitable person" and effectively precluded any limiting construction that would avoid the constitutional issue before this Court, abstention is inappropriate.

## 2.     **"Good Reason to Fear Injury" Standard**

Plaintiff's challenge to the "proper purpose" standard in Mass. Gen. Laws ch. 140, § 131(d) presents similar issues.  Like "suitable person," the term "good reason to fear injury" is open-ended.  Nonetheless, Massachusetts courts have settled the meaning of the requirement with sufficient clarity for this Court to proceed to decide plaintiff's constitutional claim.

First, there is no "substantial uncertainty . . . over the meaning of the state law" within the meaning of *Batterman*.  544 F.3d at 373.  There are, of course, uncertainties as to the exact limits of what constitutes "good reason to fear injury."  Nonetheless, it is clear that—in the context of applications for licenses to carry firearms in public for self-protection—the statute requires the applicant to demonstrate some specific circumstance giving rise to fear beyond those risks faced by the public at large.  For example, in *Ruggiero*, a former security guard had sought an unrestricted license for self-defense purposes, citing his perceived need to carry a gun to avoid "spend[ing] his entire life behind locked doors [and becoming] a potential victim of crimes against his person."  18 Mass. App. Ct. at 261.  Like plaintiff in this case, he had been awarded a license that was restricted to sport use and target practice.  The Appeals Court upheld the restriction, explaining that the statute's "proper purpose" standard imposes an independent and additional requirement beyond the "suitable person" standard for licenses to carry a weapon in public for

self-protection.  In effect, this ruling interprets the statute to require an individualized justification

for gun possession, even when possession is sought for a purpose central to the individual right

protected by the Second Amendment.  The decision thus gives the statute clear meaning with

regard to plaintiff's assertion that such a requirement of individualized justification is

constitutionally invalid.

Nor is it likely that subsequent state rulings will clarify the meaning of ch. 140, § 131 in

such a way as to avoid or modify the federal constitutional question.  Like the "suitable person"

standard, the exact contours of the term "good reason to fear injury" might be elucidated by

further rulings concerning the kinds of reasons that may be sufficient to support a license.[4]  No

such limiting construction, however, will obviate the need for this court to evaluate the

constitutionality of the statute's requirement that applicants establish individualized need.  *See*

*Houston v. Hill*, 482 U.S. at 467.

In short, abstention is inappropriate as to plaintiff's constitutional claim concerning the

"good reason to fear injury" standard.

### 3.    Delegation of License Restriction Authority

Plaintiff's contention that Mass. Gen. Laws ch. 140, § 131 is unconstitutional because it

delegates unfettered discretion to the licensing authority as to license restrictions is subject to a

similar analysis.

First, state law is sufficiently clear for this Court to engage in its constitutional analysis.

Massachusetts case law establishes that the scope of the licensing authority's discretion in

---

[4] As with the "suitable person" standard, however, the deferential standard of review applied to licensing decisions makes future clarifications as to the legal limits of the "good reason to fear injury" requirement relatively unlikely.

deciding whether to impose a restriction is vast.  Restriction decisions, like determinations relating

to the "suitable person" and "proper purpose" requirements, may be reversed only if "arbitrary,

capricious or an abuse of discretion." *Ruggiero*, 18 Mass. App. Ct. at 261.  This articulation of

the standard for judicial review adequately defines the breadth of discretion delegated to the

licensing authority under the statute.  Moreover, the *Ruggiero* decision further defines the extent

of the licensing authority's discretion by specifying several types of restrictions that are within the

scope of that discretion.  Specifically, the court held that the licensing authority's power

encompasses even a categorical policy of restricting licenses and denying all applications for

unrestricted licenses.  *Id.* at 260 (holding that the legislature, in enacting ch. 140, § 131, "intended

that the licensing authority have the power to limit *any* license granted under § 131 to a specified

purpose." (emphasis added)).[5]  It also confirms that restrictions that are not directly related to the

applicant's purpose nonetheless fall within the statute's grant of authority.  In *Ruggiero*, as here,

the applicant requested a license for self-defense purposes but received one subject to a sport- and

target-only restriction.  *Id.* at 257.  Thus, because Massachusetts courts have ruled on the precise

statutory questions relating to the restriction authority that bear on plaintiff's constitutional

claims, there is no "substantial uncertainty . . . over the meaning of the state law" within the

meaning of *Batterman*.

Abstention is also inappropriate under the second prong of the *Batterman* test.  Because

the *Ruggiero* court held that a licensing decision practically indistinguishable from the one at issue

---

[5] The *Ruggiero* court based its conclusion on the observation that the restriction authority is a corollary to the "proper purpose" requirement.  *Id.* at 260 ("We think it an illogical construction of § 131 to allow the license to issue based on a showing of one purpose, yet to allow the license to be used for various purposes not disclosed at the time the license is issued.").

here was a valid exercise of the restriction authority, that decision would be inconsistent with any limiting construction that might avoid plaintiff's constitutional arguments.  Abstention is therefore inappropriate as to this claim as well.

> ### D.      *Colorado River* **Abstention**

Although defendants did not expressly move for abstention under the *Colorado River* doctrine, a brief discussion of that doctrine is warranted.

Unlike *Pullman* abstention, which is rooted in the policy of avoiding unnecessary or premature constitutional adjudication and may apply even without a pending state action, *Colorado River* abstention reflects principles of judicial administration and applies only when parallel proceedings have begun in a state court.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).  In *Colorado River*, the Supreme Court listed several factors that may support a federal court's decision to abstain:  (1) if the state court proceeding is an exercise of *in rem* jurisdiction, (2) if the federal forum is less convenient than the state forum, (3) if abstention will avoid piecemeal litigation, and (4) if the state court proceeding was initiated prior to the federal action.  *Id.* at 818-19.  The Court left open whether other factors might be relevant to the decision to abstain, and subsequent cases have shown that this list is not exhaustive.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983).  However, the Court in *Colorado River* was emphatic in cautioning that circumstances favoring abstention are "exceptional" and that "[o]nly the clearest of justifications will warrant dismissal." *Colorado River*, 424 U.S. at 818-19.

This case does not present the kind of exceptional circumstances that would justify abstention under *Colorado River*.  It is true that plaintiff first brought suit in state court, and the

17

two proceedings do constitute piecemeal litigation.  But there is little inconvenience created by this federal suit, and no risk of conflicting assertions of jurisdiction as might be the case in an *in rem* proceeding.  Moreover, although plaintiff's state law and federal constitutional claims may be divided piecemeal as between state and federal courts, respectively, there is little risk of duplicative litigation.  The focus of the action in state court is whether the Police Chief's licensing decision was arbitrary, capricious, or an abuse of discretion.  This action concerns the facial and as-applied constitutionality of the statute itself.  These circumstances do not provide clear justification for this court to abdicate its duty to vindicate federal constitutional rights.

## IV.   Conclusion

For the foregoing reasons, the defendants' motion to stay or dismiss this action pending resolution of plaintiff's proceeding in state court is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: October 12, 2011

18