**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
**HECTOR E. PINEIRO,**                  )
                                        )
        **Plaintiff,**                  )
                                        )
        **v.**                          )        **Civil Action No.**
                                        )        **10-40262-FDS**
**GARY GEMME, Worcester**               )
**Chief of Police, and the CITY OF**    )
**WORCESTER, a municipal**              )
**corporation,**                        )
                                        )
        **Defendants.**                 )
_____)

**MEMORANDUM AND ORDER ON DEFENDANTS'**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

        This action originated as a federal constitutional challenge to the partial denial of

plaintiff's application for a gun license.  Plaintiff Hector Pineiro applied to the Worcester Chief

of Police for an unrestricted license that would allow him to carry a concealed weapon in public

for self-defense.  The police chief—who, by statute, is charged with processing gun-license

applications—originally granted him a license that was restricted to sport and target-shooting

uses.  Pineiro sought judicial review of the licensing decision in Massachusetts state court,

alleging violations of the state gun-licensing statute, Mass. Gen. Laws ch. 140, § 131.  He

concurrently sued the city and the police chief in this Court, alleging violations of his federal

constitutional rights to bear arms under the Second Amendment and to equal protection under

the Fourteenth Amendment.

        Eventually, the police chief granted Pineiro's application to carry a firearm for all

purposes, and the parties filed a stipulation for partial dismissal as to most of the claims.  What

remains is an action under 42 U.S.C. § 1983 seeking money damages for the period of time during which Pineiro's ability to carry a firearm was restricted.

Defendants have filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on the grounds that Pineiro has failed to establish an actionable deprivation of his Second Amendment rights, and that he has failed to establish that similarly situated citizens were treated differently in violation of his right to equal protection of the law.

## I.    Factual Background

The facts are stated as alleged in the pleadings and are presented in the light most favorable to the plaintiff.  However, almost all of the relevant facts are uncontested.

Hector E. Pineiro lives and works as an attorney in Worcester, Massachusetts.  (Compl. ¶¶ 3, 12).  Since 1999, he has maintained an office in the Main South neighborhood of Worcester, an area with a relatively high rate of violent crime and drug use.  (*Id.* at  ¶¶ 17-20, 29-30).  Pineiro often works late at the office, and on several occasions he has witnessed crimes in progress when leaving at night.  (*Id.* at ¶¶ 24-25).  Statistics indicate that the incidence of violent crime in Worcester increased by about thirty percent between 2004 and 2009.  (*Id.* at ¶ 29).

Pineiro perceived violent crime to be a threat to his own safety and to that of his family. In 2009, he began to consider seeking a license to carry a firearm for self-protection.  (*Id.* at ¶ 31).  In January 2010, two gun-wielding individuals entered his home and assaulted his 18-year-old son.  (*Id.* at ¶ 26).  In August 2010, a resident of Main South told Pineiro that two males had been seen attempting to break into his office through the second-story window.  (*Id.* at ¶ 39). These events convinced Pineiro to apply for the gun license.  (*Id.* at ¶ 32).

In Worcester, Chief of Police Gary J. Gemme is the licensing authority charged with processing gun-license applications under Mass. Gen. Laws ch. 140, § 131.  (*Id.* at ¶ 4).  In 2006, Chief Gemme adopted a policy under which eligible new applicants would be issued only restricted licenses.[1]  In August 2010, Pineiro applied to Chief Gemme for an unrestricted license to carry a large-capacity firearm.  (*Id.* at ¶ 45, Ex. 3).  In the application, Pineiro said he had "good reason to fear injury " to his person or property, citing the prior invasion of his home and crime in the area surrounding his office.  (*Id.*).

On September 24, 2010, Gemme granted Pineiro a license, but not the license he wanted.  (*Id.* at ¶¶ 64, 82, 83, Ex. 7, Ex. 8).  Instead of the "unrestricted" license that Pineiro had requested, which would have allowed him to carry a concealed weapon in public for all lawful purposes, Gemme issued a license subject to the restriction that the gun could be used only for sport and target-shooting.  (*Id.*).

On December 22, 2010, Pineiro filed an action in the state District Court in Worcester pursuant to Mass. Gen. Laws ch. 140, § 131(f), seeking judicial review of the chief's licensing decision.  (*Id.* at  ¶ 113, Ex. 9).

On December 31, 2010, Pineiro filed this action against Chief Gemme and the City of Worcester.  The complaint asserts claims under 42 U.S.C. § 1983 and alleges that the Gemme policy, as applied, violated Pineiro's rights to bear arms and to equal protection under the Second and the Fourteenth Amendments of the United States Constitution.[2]

On March 17, 2011, Gemme suspended Pineiro's license pursuant to Mass. Gen. Laws

---

[1] It is undisputed that Chief Gemme has rescinded that policy during the pendency of this action.

[2] The complaint originally also alleges that the Gemme policy and the Massachusetts licensing statute are facially unconstitutional. Those claims were dismissed by stipulation on February 2, 2012.

3

ch. 140, § 131(f) as a result of the following incidents:  (1) on March 11, 2011, an unknown individual operating a motor vehicle registered to Pineiro was involved in a shootout on a public street in Worcester; and (2) on March 16, 2011, Pineiro's son was pulled over in Worcester while operating the family motor vehicle.  In the motor vehicle were unlawful drugs and an unlawful firearm.  (Def. Joint St. ¶ 2).

On May 5, 2011, Gemme removed the license use restriction (sporting and target) that Pineiro was challenging at the time of the filing of this action.  (*Id.* at ¶ 3).  However, Pineiro's license remained suspended while the Worcester Police Department continued to investigate the incidents described above.  (*Id.*)  On September 16, 2011, Gemme removed the suspension and reactivated Pineiro's Class A license to carry a firearm for all lawful purposes (that is, without any restriction).

On February 2, 2012, the parties filed a Stipulation of Partial Dismissal indicating that (1) Pineiro had been issued an unrestricted Class A license to carry a firearm and (2) that Pineiro dismissed all claims challenging the constitutionality of Mass. Gen. Laws ch. 140, § 131 and all claims seeking injunctive or declaratory relief.  (Stip. of Part. Dis.).

The remaining claims seek compensatory (or, alternatively, nominal) and punitive damages under § 1983 for violations of Pineiro's federal constitutional rights.

## II.    **The Regulatory Framework**

### A.    **Massachusetts Law**

In Massachusetts, it is a felony to carry a firearm in public without a valid license.  Mass.

Gen. Laws ch. 269, § 10.[3]  Licenses to carry guns may be requested by application pursuant to

Mass. Gen. Laws ch. 140, § 131(d).  Applications are made to a "licensing authority," which is

defined as either the applicant's local chief or the State Police colonel.  *Id.* §§ 121, 131(d).[4]  The

statute specifies the circumstances under which the licensing authority may grant licenses, when

licenses may be revoked, and what restrictions licenses may contain.  *Id.* § 131(a)-(b).  Licensing

decisions are subject to judicial review in the District Court having jurisdiction in the locality

wherein the person applied for the license.  *Id.* § 121(f).

In processing a license application, the licensing authority is required to conduct a

"two-step inquiry" to determine the applicant's eligibility.  *Ruggiero v. Police Com'r of Boston*,

18 Mass. App. Ct. 256, 259 (1984).  At the first step of the inquiry, the licensing authority looks

at the applicant's personal suitability for gun ownership.  *Id.*  Several specific groups of

applicants (for example, minors and the mentally ill) are categorically barred from gun

possession.  Mass. Gen. Laws ch. 140, § 131(d)(i)-(vii).  However, even an applicant who does

not fall within the statute's specific exclusions is ineligible for a license unless the applicant can

demonstrate that he or she "is a suitable person to be issued such license."  *Id.* § 131(d).

At the second step of the application inquiry, the licensing authority is required to

consider whether the applicant has a "proper purpose" for carrying a firearm.  *Ruggiero*, 18

Mass. App. Ct. at 259.  The statute does not give an exhaustive list of valid reasons for seeking a

---

[3] For purposes of the statute, "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured."  Mass. Gen. Laws ch. 140, § 121.

[4] The statute distinguishes Class A licenses (for large-capacity firearms) from Class B licenses (for non-large-capacity firearms), but the same application procedures apply to both.  *Id.* § 131(a)-(b), (d).

license; it merely provides that the applicant must show "good reason to fear injury to his person or property, or . . . any other reason, including the carrying of firearms for use in sport or target practice." Mass. Gen. Laws ch. 140, § 131(d). Massachusetts courts have confirmed that this "proper purpose" showing, while open-ended, is a prerequisite to license approval that is distinct from the "suitable person" determination. *Ruggiero*, 18 Mass. App. Ct. at 260. Thus, when an applicant seeks a license solely for self-protection, the license authority may rely on the purpose requirement in demanding that the applicant distinguish his or her own needs from those of the general public. *Id.* at 261 (finding that applicant's stated purposes to avoid "spend[ing] his entire life behind locked doors [and to prevent becoming] a potential victim of crimes" did not require issuance of a license for self-defense in public).

Even when an applicant meets the requirements for license approval, the licensing authority may issue the license "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. Laws ch. 140, § 131(a). Pursuant to this provision, the licensing authority may restrict a license to those uses for which the authority determines there to be a "proper purpose," even if it is not the purpose proposed by the applicant. *Ruggiero*, 18 Mass. App. Ct. at 260 (upholding issuance of license for target and sport use where applicant requested license for self-defense purposes).

Upon judicial review, the licensing authority's determination regarding suitability may be reversed only if it has "no reasonable ground" or is "arbitrary, capricious, or an abuse of discretion." *Chief of Police of Shelburne v. Moyer*, 16 Mass. App. Ct. 543, 546 (1983). Likewise, the licensing authority's determination regarding the "proper purpose" may be reversed only if the decision is "arbitrary, capricious or an abuse of discretion." *Id.* at 259

(citing *Moyer*, 16 Mass. App. Ct. at 546).

**B.     The Policy of the Worcester Police Chief**

As noted, Chief Gemme is the relevant licensing authority under ch. 140, § 131.  In that capacity, Chief Gemme issued a directive on February 13, 2006, setting forth his policy for implementing the statute's licensing standards.

The 2006 policy began with the following paragraph:

> The purpose of this policy is to clarify and limit the scope of privileges granted to applicants for a license to carry (LTC) firearms.  The Massachusetts General Laws (MGL) that govern the issuance of a LTC firearms grants the local police chief the discretionary authority in two areas: the first, the determination of a "suitable person," and second, limitations as to the use or purpose of the license. It is my intent to narrowly define the use or purpose on all LTC applications, and correspondingly, on all LTC permits, and to establish a high standard for the term "suitable person."

(Compl. Ex. 5).  It then discussed the requirements for being a "suitable person."  The 2006 policy continued as follows:

> With regard to proper use or purpose, MGL grants the authority to the Chief of Police to place restrictions relative to the possession, use, or carrying of a firearm.  The intent of this policy is to narrowly define the requested use or purpose and issue a LTC based upon the applicant's request.  The request for "all lawful purposes," shall not be granted.
>
> The LTC issued by the Chief of Police shall specifically state the use or purpose. The following guidelines shall be used in determination of use or purpose.
>
> 1.  Personal protection - good reason to fear injury to his person or property.  The good reason needs to be specifically articulated on the application for the LTC.
>
> 2.  Additional Limitations for personal protection:
>
> >      a.  Work/Employment Only: concealed or non-concealed;
> >      b.  Employment Only: May only be used in public while acting within the scope of employment;
> >      c.  Only while transporting money to and from place of

employment to depository;
   d. Business Only: Not to be removed from business;
   e. Day-time only, from one-half hour before sunrise to one-half
      hour after sunset;
   f. No firearm removed from residence/Home Only.

  3. Sporting - hunting and target club only;
  4. Target - at shooting club or facility only;
  5. Hunting - large capacity rifle and shotgun only;
  6. All lawful purposes - restricted to active and retired law enforcement officers.

(*Id.*) (errors in original).  The policy has had the effect of limiting new applicants to the receipt

of restricted licenses.

## III.   Standard of Review

A Rule 12(c) motion for judgment on the pleadings "is treated much like a Rule 12(b)(6)

motion to dismiss."  *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008).  It differs

from a Rule 12(b)(6) motion primarily because it is filed after the close of pleadings and

"implicates the pleadings as a whole."  *Aponte-Torres*, 445 F.3d at 54-55.  Because a Rule 12(c)

motion "calls for an assessment of the merits of the case at an embryonic stage, the court must

view the facts contained in the pleadings in the light most favorable to the nonmovant and draw

all reasonable inferences therefrom to the nonmovant's behoof."  *R.G. Financial Corp. v.

Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).

However, to survive a motion for judgment on the pleadings, the complaint must state a

claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That

is, "[f]actual allegations must be enough to raise a right to relief above the speculative

level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  The court will therefore grant defendant's motion for judgment on the pleadings if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief."  *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## IV.    Analysis

The complaint asserts claims for money damages under 42 U.S.C. § 1983.  Section § 1983 is not itself a source of substantive rights, but rather provides a means for vindicating rights conferred by the Constitution or laws of the United States.  *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  The complaint identifies the Second and Fourteenth Amendments as the source of the substantive rights allegedly infringed by defendants.  The stated basis for the constitutional claims are the rights to bear arms and to equal protection under the law.  The complaint asserts both a claim against Chief Gemme personally and a *Monell* claim against the City of Worcester, contending that the City maintained an unconstitutional policy of denying unrestricted licenses to first-time applicants and maintained an exception to that policy that violated the Equal Protection Clause.

In order to prove a claim under § 1983, plaintiff must show that (1) the conduct complained of was carried out under color of state law and (2) that conduct deprived the plaintiff or rights, privileges, or immunities secured by the Constitution or laws of the United States.  *Collins v. Nuzzo,* 24 F.3d 246, 250 (1st Cir. 2001).   The parties agree that Chief Gemme was acting under color of state law, in his capacity as the licensing authority of the City and in accordance with statutory authority under Mass. Gen. Laws ch.140, §131.  The issue as to Chief Gemme is therefore whether his conduct denied plaintiff his right to bear arms under the Second

Amendment or to equal protection under the Fourteenth Amendment.

In order to prevail against the City of Worcester, plaintiff must further show that "the municipality *itself* caused the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). Thus, plaintiff is required to demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation. *Harris*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy must be the "moving force [behind] the constitutional violation"); *Santiago v. Fenton*, 891 F.2d at 373, 381-82. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). In this case, it is uncontested that the 2006 directive by Chief Gemme was a written policy adopted by the City of Worcester. Therefore, the only disputed issue is whether the policy caused a violation of plaintiff's Second Amendment rights.

### A.     Mootness

Because "federal courts lack jurisdiction to decide moot cases," the Court must first determine whether any of plaintiff's claims have been rendered moot as a result of the revocation of the Gemme policy and the removal of any restrictions from his license to carry. *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983). A case becomes moot when "intervening events make it impossible to grant the prevailing party effective relief." *Pine Tree Medical Assocs. v. Secretary of HHS*, 127 F.3d 118, 121 (1st Cir. Me. 1997) (citing *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996)). Plaintiff has voluntarily

dismissed all claims for injunctive or declaratory relief, which would have been mooted by the

repeal of the policy and the reissuance of his license without any restrictions.  *See, e.g., Miller v.*

*Benson*, 68 F.3d 163, 165 (7th Cir. 1995) (amendment of statute mooted claim); *Utah Animal*

*Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (claim moot where

statute repealed).  Plaintiff continues, however, to seek money damages for the period during

which (he contends) he suffered a violation of his constitutional rights.  Those claims have not

been rendered moot, because he alleges a deprivation of constitutional rights for which a remedy

is still available under § 1983.  *See, e.g.*, *Kuperman v. Wrenn*, 645 F.3d 69, 73 (1st Cir. 2011).

### B.   <u>Scope of Second Amendment</u>

Plaintiff alleges that Chief Gemme's refusal to grant him an unrestricted license to carry

a firearm violated his constitutional right to bear arms for the purpose of self-defense.  The

Second Amendment provides as follows:  "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. CONST. amend. II.  In 2008, the Supreme Court struck down a District of Columbia

ordinance that prohibited the possession of handguns in the home, declaring that the amendment

guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and

home."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  In 2010, the Court affirmed

that the "right to posses a handgun in the home for the purposes of self-defense" is incorporated

into the protections against infringement by the states provided by the Fourteenth Amendment.

*McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010).

Plaintiff contends that he has a constitutional right to carry a firearm outside the home for

the "core lawful purpose" of "self-defense."  Neither *Heller* nor *McDonald* addressed the

11

question of Second Amendment rights outside the home.  Rather than attempt to answer the

difficult constitutional question presented here, the Court will instead proceed directly to the

qualified immunity analysis.  *See United States v. Garcia-Hernandez*, 659 F.3d 108, 116 (1st

Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)) ("It is now permissible for a court

to determine that considerations such as judicial economy and the danger of premature

constitutional adjudication counsel against resting its decision on constitutional grounds.

Instead, the court first may determine that, at the time they acted, the defendants' actions did not

violate settled constitutional principles.").

### C.     Qualified Immunity

The doctrine of qualified immunity protects public employees "from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982).  The qualified-immunity analysis employs a two-part test:  (1) whether the facts

alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether

the right at issue was clearly established at the time of the defendant's alleged misconduct.

*Pearson*, 555 U.S. 223; *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).  For

purposes of the second step of that analysis, whether the right in question was "clearly

established" depends on "(a) whether the legal contours of the right in question were sufficiently

clear that a reasonable officer would have understood that what he was doing violated the right,

and (b) whether in the particular factual context of the case, a reasonable officer would have

understood that his conduct violated the right."  *Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st Cir.

2011).

The qualified-immunity doctrine "leaves ample room for mistaken judgments." *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). The question is not whether some right has been clearly established at a highly abstract level—for example, the right to bear arms—but "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *McBride v. Taylor*, 924 F.2d 386, 389 (1st Cir. 1991).

The initial question, therefore, is whether the "legal contours" of the constitutional right in question were "sufficiently clear" that a reasonable officer would have understood that what he was doing violated that right. In this context, the answer to that question is relatively easy: the legal contours of the asserted right—that is, the constitutional right to carry firearms outside the home for self-defense—were entirely unclear in 2010, and are hardly more defined today.

The decision challenged here occurred sometime in August or September of 2010; the Supreme Court had only just decided in June of that year that the Second Amendment was even incorporated against the states. *See McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). It was only two years earlier that the Supreme Court had definitively established the individual, as opposed to collective, nature of the right. *See District of Columbia v. Heller*, 554 U.S. 570, 579-81 (2008).

Significantly, the Supreme Court explicitly avoided defining the contours of the right to bear arms in both *Heller* and *McDonald*. *See Heller*, 554 U.S. at 634 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field."); *McDonald*, 130 S. Ct. at 3049 (expressly rejecting the

notion that courts will be required to assess the costs and benefits of firearms regulation, but providing no specific alternative means of scrutinizing them).  Since *Heller*, the First Circuit has addressed the Second Amendment on four occasions, none of which resolved the issue presented here.

First, in *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), the First Circuit held that a federal statute prohibiting juvenile possession of handguns did not violate the Second Amendment.  Among other things, the court observed that Second Amendment rights are "not unlimited," citing to various historical restrictions on the possession of firearms by different classes of people, and noting that *Heller* did not disturb that line of authority.  *Id.* at 12.  The court also noted that *Heller* "did not identify a standard of review for regulations that restrict Second Amendment rights, apart from rejecting rational basis review and 'interest-balancing.'"  *Id.* at 11 n.4 (quoting *Heller*, 554 U.S. at 628 n.27).

Second, in *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), the court upheld a Massachusetts criminal statute making it illegal for a person convicted of a domestic violence misdemeanor to own a gun.  The court applied an intermediate level of scrutiny, according to which "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective."  *Id.* at 25 (quoting *United States v. Skoien*, 614 F.3d 628, 642 (7th Cir. 2010)).

Third, in *Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012), the court upheld the Massachusetts firearms licensing scheme set forth in Mass. Gen. Laws ch. 140, § 131.  It found that the revocation of Hightower's license on the basis of her providing false information as to

14

pending complaints or charges on the application form was not a violation of the Second

Amendment. *Id.* The court found that her as-applied claim failed regardless of the standard of

scrutiny, and, therefore, declined to reach the question of precisely what standard of scrutiny

applies in the Second Amendment context. *Id.* at 74.

The *Hightower* court did not reach the question of the scope of the right to possession of

a firearm outside the home. In a footnote, it aptly summarized the then-present state of the law

as to that issue:

> Some courts appear to have held that the Second Amendment does not extend outside the
> home. [citations omitted] Other courts have remarked that the application of the Second
> Amendment outside the home is far from clear. [citations omitted] Other courts have
> found that the Second Amendment extends outside the home. [citations omitted].

693 F.3d at 72 n.8.

Finally, in *United States v. Armstrong*, 2013 U.S. App. LEXIS 1350 (1st Cir. 2013), the

First Circuit recently reaffirmed its holding in *Booker* and, in so doing, confirmed that the court

"has not adopted intermediate scrutiny as the appropriate type of review for a challenge [to

restrictions on gun ownership]."

Thus, neither the Supreme Court nor the First Circuit has, even today, directly addressed

the scope of the right to bear arms outside the home for purposes of self-defense. Moreover, in

*Hightower*, the First Circuit expressly adopted the cautionary approach of Judge Wilkinson in

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) that "[courts] should not engage in

answering the question of how *Heller* applies to possession of firearms outside of the home,

including as to 'what sliding scales of scrutiny might apply.'" 693 F.3d at 474. As the Second

Circuit noted in *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) :

What we know from [*Heller* and *McDonald* ] is that Second Amendment

15

> guarantees are at their zenith within the home.  What we do not know is the scope
> of that right beyond the home and the standards for determining when and how
> the right can be regulated by a government.  This vast "terra incognita" has
> troubled courts since *Heller* was decided.

(internal citations omitted).

In short, *Heller* and *McDonald* left open the issue of the application of the Second Amendment to the regulation of firearms outside the home.  There is no controlling First Circuit precedent, nor even a general consensus among federal courts as to even the most basic points—such as whether the protections of the Second Amendment extend outside the home, or what standard the courts should apply in assessing government regulation of firearms outside the home.   As a result, the only clearly established rule of law at the time Chief Gemme made his licensing decision was that the Second Amendment guaranteed "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Heller*, 554 U.S. at 635.

Considering this area of law is still very much unsettled, it is hard to see how Chief Gemme would have been unreasonable in believing that denying plaintiff an unrestricted license to carry was constitutional.  The license he issued plaintiff permitted him to keep a firearm for self-defense in the home and to take it outside the home for the purposes of sport and target-shooting.  While this restriction may have been arbitrary considering plaintiff's application made no mention of sport and target-shooting, an objectively reasonable police officer could have believed it to be constitutional.  Accordingly, the Court finds that Chief Gemme is entitled to qualified immunity.

16

### D.    *Monell* Claim as to the Gemme Policy

As noted, in order for the municipality to be liable for an alleged constitutional deprivation, plaintiff is required to demonstrate a "direct causal link" between the challenged policy and the alleged constitutional deprivation.  *Harris*, 489 U.S. at 385.  Here, whether the policy can be said to have "caused" the alleged constitutional violation depends on how the Court interprets the policy.  Plaintiff  contends that the policy required the Chief to place restrictions on *all* new licenses to carry such that *no* new license holder could lawfully carry his weapon for self-defense outside the home.  This characterization, however, misreads the policy, at least as it is written.

The policy is poorly written and often ambiguous, making its interpretation somewhat less than straightforward.  It appears to be true that the policy does, in fact, require that restrictions be placed on *all* license holders; it specifically states that a request for a license for "all lawful purposes . . . shall not be granted."  (Compl. Ex. 5).[5]  However, an applicant who establishes "good reason to fear injury to his person or property" (and who has specifically articulated that reason on the application) may obtain a license.  The policy then lists six possible "additional limitations."  (*Id.*)   The policy does not say whether any such additional limitation is mandatory; as written, the policy would apparently permit zero, one, or some larger number of limitations to apply.[6]  Only one of those six "additional limitations"—"No firearm removed from residence/Home Only"—would entirely prohibit carrying a firearm outside the home.  (*Id.*).

---

[5]  Entirely inconsistently, the policy goes on to state that licenses for "[a]ll lawful purposes" are "restricted to active and retired law enforcement officers."  The effect of that inconsistency, however, is not at issue in this case.

[6]  Each of the limitations uses the word "only" (for example, "Employment Only").  Nonetheless, there is nothing on the face of the policy that would clearly prevent the issuance of a license with two or more limitations, such as "employment and home only," although the language is certainly ambiguous.

The policy as written thus does not prohibit the carrying of a firearm outside the home for personal protection under all circumstances.  Again, and as written, it would permit a license for "personal protection" without limitation, or subject to one or more specific limitations, most of which would permit the carrying of a firearm outside the home.[7]

The Supreme Court held unequivocally in *Heller* and *McDonald*—and plaintiff concedes—that the Constitution does not create a right to carry a firearm "in any manner whatsoever and for whatever purpose."  554 U.S. at 626, 630; *McDonald*, 130 S. Ct. at 3036, 3047.  At least some restrictions are thus constitutionally permissible.  What restrictions are permissible, however, is far from clear, given the unclear status of the law.

Many courts have analogized to First Amendment case law when attempting to define the constitutional bounds of regulations that burden the Second Amendment.  While that approach should not necessarily be imported wholesale, a useful analogy to "time, place, and manner" restrictions on free speech and association may be drawn here.  The policy at issue is somewhat analogous to decisions to issue permits for gatherings in public places in the First Amendment context.  In such cases, it is well-established that a time, place, and manner regulation must contain adequate standards to guide the official's decision and render it subject to effective judicial review.  Pursuant to such a regulation, the permitting authority may deny a permit for one or more of the reasons set forth in the regulation, a decision which must then be subject to review.  *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002).  When such a policy is abused or misapplied, the appropriate remedy has not been to strike down the policy itself, but to reverse

---

[7] Whether a written policy that in fact prohibited the carrying of a firearm outside the home for personal protection under all circumstances (for example, by limiting all such uses to hunting, sporting, or target uses) would be constitutional is an issue that this Court does not reach.

the decision.  *Accord id.* at 325 ("Granting waivers to favored speakers (or, more precisely,

denying them to disfavored speakers) would of course be unconstitutional, but we think that this

abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by

insisting upon a degree of rigidity that is found in few legal arrangements.").

       The policy here established a roughly similar scheme for firearms licensing decisions.

That policy, as written, appears to be constitutional.  While no model of clarity or internal

consistency, it does contain standards that are no less "narrowly drawn, reasonable and definite"

than those found constitutionally adequate to protect First Amendment rights in Thomas. Id.

(internal quotations omitted).  Moreover, the concerns of "prior restraint" that motivate the

constitutional doctrine as to permits for public gatherings in the First Amendment context have

not been held applicable to Second Amendment rights.  *See Hightower*, 693 F.3d at 81 ("We

have found no circuit cases that have discussed the prior restraint doctrine in the context of the

Second Amendment.); *Kachalsky*, 701 F.3d at 92 (stating that it would be "imprudent to assume

that the principles and doctrines developed in connection with the First Amendment apply

equally to the Second").  The fact that the particular restriction placed on Pineiro may have been

unreasonable is not the fault of the written policy, but rather the alleged misapplication of it.[8]

       There is no allegation in the complaint that Gemme's licensing decision as to plaintiff's

application established, by itself, an official policy significantly different from the one in the

---

[8] This is evident in the allegations of the complaint itself, which contend that "Gemme grants, denies and/or restricts LTCs arbitrarily and capriciously."  That is the standard applied to judicial review of licensing decisions under the Massachusetts licensing scheme.  *See* Mass. Gen. Laws ch. 140, § 122B (providing that "after a hearing, [the court] may direct that a license be issued the applicant if satisfied there was no reasonable ground for refusing such license and that the applicant was not prohibited by law from holding the same").  In addition, it is not entirely clear that plaintiff would have succeeded on such a claim for judicial review.  The fact that he completed a five-day Hunters Education Course sponsored by the Massachusetts Division of Fisheries and Wildlife does suggest that he had at least some interest in obtaining a firearm permit for the purpose of hunting.

written directive.  Although in certain circumstances the single act of an official with final

policymaking authority, such as the Chief, can subject the municipality to liability, such a

determination is not always warranted.  *See Harrington v. Almy*, 977 F.2d 37, 45 (1st Cir. 1992)

(citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986) (plurality) ("[A] single

decision can be a policy for *Monell* purposes, if it is made by the official charged with the final

responsibility for making it under local law.").  Concurring in *Pembaur*, Justice White clarified

the Court's ruling on this subject, writing that "[i]f deliberate or mistaken acts like [the one at

issue], admittedly contrary to local law, expose the county to liability, it must be on the basis of

respondeat superior and not because the officers' acts represent local policy.  Such results would

not conform to *Monell* and the cases following it."  475 U.S. at 486 (White, J., concurring).  In

the absence of evidence to the contrary, the Court is compelled to conclude that Chief Gemme's

licensing decision with regard to plaintiff's application did not itself constitute a "policy" of the

City of Worcester within the meaning of §1983 and *Monell*.[9]

Accordingly—and regardless of whether plaintiff has a legitimate claim concerning the

chief's decision as to the *particular* restrictions placed on his license to carry—the *general*

policy of placing some restriction(s) on new licenses did not "directly cause" a violation of his

constitutional rights.  Accordingly, the City of Worcester may not be found liable under *Monell*.

### E.  Equal Protection Clause Claim

The Equal Protection Clause of the Fourteenth Amendment provides that similarly

---

[9] *Accord Egebergh v. Sheahan*, 2001 U.S. Dist. LEXIS 161, 13-14 (N.D. Ill. Jan. 3, 2001) (citing *Vela v. Village of Sauk Village*, 218 F.3d 661, 666 (7th Cir. 2000)) (holding that in order for a county to be liable under §1983, the policymaker's choice "must have  been a 'deliberate' attempt to establish new policy. . . . [and there was] no evidence to suggest that [policymaker] was deliberately trying to change the policy at the Rolling Meadows Courthouse concerning when paramedics would be called in a medical emergency.").

situated persons are entitled to receive similar treatment at the hands of government actors. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal protection claim, a plaintiff must allege that he "was treated differently from 'others similarly situated . . . based on impermissible considerations." *Clark v. Boscher*, 514 F.3d 107, 114 (1st Cir. 2008) (quoting *Aponte-Torres*, 445 F.3d at 57). The Supreme Court has held that differential treatment based on suspect classifications (race, national origin, religion, or alienage) is subject to strict scrutiny; differential treatment based on quasi-suspect classifications (gender or illegitimacy) is subject to intermediate scrutiny; and differential treatment based on all other classifications simply must survive a rational basis inquiry.

The primary classification plaintiff relies on here is service on the police force. The Gemme policy—by its terms, and, according to plaintiff, in its application—created an exception whereby police officers were the only class of citizens granted unrestricted licenses to carry on their first application. This is not a suspect or quasi-suspect classification, and therefore is subject only to rational basis inquiry, which asks whether "there is a rational relationship between disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). When a policy is subject to rational basis review under the Equal Protection Clause, there is a presumption of constitutionality and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The legitimate government purpose offered by the city is protecting the safety of its citizens, which is perhaps the most important of government functions. Defendants maintain that public safety is enhanced by granting police officers unrestricted licenses to carry firearms,

because it allows them to do their job fighting crime.  Furthermore, this classification extends to off-duty and retired officers, because the police training they received greatly increases the chances that they will not inadvertently harm another citizen when carrying or discharging their firearm.  Even viewing the facts in the light most favorable to plaintiff, he has not shown how this particular classification fails to advance the important government interest articulated.  He instead alleges that particular police officers should not have been entitled to licenses based on other factors, or were at least less qualified than he because of those other factors.  He does not, however, allege anything about the rate of gun crimes or accidents at the hands of off-duty Worcester police officers versus the rate for the general population, a fact that might bear on the rationality of the policy.

In any event, the burden on a party challenging a classification under the "rational basis" standard is very heavy, and plaintiff here has not met that demanding standard.  Accordingly, the Court finds that the plaintiff cannot sustain his burden to show that the differential treatment given to police officers in the firearm licensing policy was irrational and therefore violated the Equal Protection Clause.

## IV.   Conclusion

For the foregoing reasons, the defendants' motion for judgment on the pleadings is GRANTED and the case is hereby DISMISSED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge
Dated:  March 26, 2013